MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Lori W. and James B., who are the biological parents of the minor child, Cassandra B., who was born on December 28, 1989. The minor child, Cassandra B., is presently 7 years and 11 months of age. On October 27, 1992, the Superior Court for Juvenile Matters in Rockville granted an Order of Temporary Custody removing Cassandra from her mother's home. On July 14, 1993, the child was adjudicated neglected (Goldstein, J.) and committed to the care and custody of the Commissioner of the Department of Children and Families ("DCF") for a period not to exceed eighteen months. That commitment has been extended many times. Cassandra B. has lived for the past nearly four years with various foster parents. The inexcusable delay by DCF in filing for termination of parental rights and the wholly unacceptable allegations of the petition itself, will also be addressed in this decision.
The court finds that the mother has appeared during the pendency of the case and she testified at the trial. She has a court appointed attorney. The father has been served and had counsel appointed. The court has jurisdiction in this matter; there is no pending action affecting custody of the child in any other court, and reasonable efforts have been made to reunify this family.
The male biological parent of Cassandra B. is one James B. A consent to terminate his parental rights form was filed by James B. on February 13, 1997. His consent was found to be voluntarily and knowingly made with the advice and assistance of competent legal counsel and with a full understanding of the legal consequences of his consent (Peck, J.). CT Page 11259
The court, having read the verified petitions, the social studies, and the various documents entered into evidence and having heard the testimony of the case worker, makes the following findings by clear and convincing evidence.
I. What DCF knew and when they knew it:
The principal family members are:
Cassandra, the child, born, December, 1989;
J. W., her half brother, born February, 1984;
Christopher, her half brother, born July, 1987;
Cassandra's mother, the respondent, Lori W., born, March 1966; and
Cassandra's maternal grandmother, Linda W., born August 1948.
Cassandra's maternal grandmother, that is, the respondent's mother, Linda W., was evaluated by Dr. Ronald Anderson in March of 1993, along with her daughter and granddaughter. All of the following reported information was known to DCF no later than that date. Most of the following information was known to DCF well before that date, as even Dr Anderson took much of his information from a report by Dr. David Mantell who had completed a family evaluation of Lori and her, then born, children in 1988, a year before Cassandra was born and again in 1990. That 1988 report was done pursuant to a neglect petition filed on behalf of Cassandra's older brother, Christopher, on June 3, 1988.
Dr. Anderson reported that Cassandra's maternal grandmother was
 ". . . a grossly obese 44 year old women . . . with below average intellect, well below average normative range . . ., and the mother of Lori W. (Cassandra's mother). She recalled a childhood of emotional and physical abuse by her mother . . . Her memories were that her mother was harshly punitive, uncaring, and that she unfairly favored Linda's brothers. Linda was sexually victimized in her childhood, but the older married man with whom she had sexual intercourse at 14 years old was also a source of emotional support, and the villain in her account of the incident was her mother, who persecuted her older lover and drove him away. She became pregnant and defiantly chose to keep the child, Lori, which CT Page 11260 decision initially signaled her independence from her mother . . . Linda's conflict with her own mother appears to have influenced her early relationship with Lori. There were no fond recollections of emotional bonding with her daughter. The DCYS records (the Department of Children and Youth Services, now known as DCF), suggest that Linda has long been reproachful of Lori's actions, particularly in Lori s actions as mother. Lori, who also became pregnant as a teenager, did not shoulder the responsibilities as Linda once did, by getting a job . . . She did leave her first child with her mother, but reportedly kept the money she received from the state for herself.
At the time of Dr. Anderson's 1993 evaluation, Lori had been previously analyzed by a psychiatrist in 1989 pursuant to court order, and had been the subject of the psychological evaluation by Dr. Mantell in 1988. Accordingly, DCF had the following information about Cassandra's mother, the respondent, Lori:
 Background Information: Lori is a 26 year old women who said she was born as a result of a "one night stand." She was raised by her mother Linda, and has three younger siblings, each of whom has a different father. She said that one of her mother's boyfriends, her brother Kenny's father, raped her when she was 8 to 11 years old. She admitted that she and her mother have histories of heavy alcohol use . . .
Lori said that for discipline, her grandparents would: "Just yell at you." She claimed that her mother would: "Just leave and not come back for a week or two." She also recalled that when her mother was angry, she ignored her, and Lori thought she didn't like her. She added that when she told her mother she was raped by her mother's boyfriend, her mother first thought she was lying and then accused her of trying to steal the boyfriend. She said she then slept in a doghouse with the family St. Bernard, who was her "protection" until her mother's boyfriend shot and killed the dog . . . Lori believed that in 1989, the boyfriend was convicted for sexually abusing three daughters. . . . Lori said her mother "put her away" at eleven years old, after she disclosed the sexual abuse by her mother's boyfriend. She said she lived at a DCYS worker's house for six months and was then placed in foster care . . . Lori said that at seventeen years old, while she was at CREC, she was "knocked out cold in the girl's bathroom" and raped by another student. Her son [J.W.], was the result of that attack . . . CT Page 11261
Mental Status: Lori is a short, grossly obese 26 year old woman who presented with below average intellect . . . mood was depressed. Affect was blunted.
Clinical Impression: Lori is a 26 year old woman with bitter childhood memories of severe emotional, physical and sexual abuse . . . She felt rejected by her mother from an early age, and then felt betrayed when her mother refused to credit her account of sexual abuse by her mother's boyfriend . . . The impression is that the conflict between her mother and daughter began in Lori's child hood, and played a prominent role in her disrupted emotional development and institutional placement. The clinical impression is that Lori is an emotionally unstable young woman with a very limited range of coping resources . . .
Page 36. Question 2. What interventions, treatments, supportive services or rehabilitative efforts, if any, would be required to remedy or improve each of the problems noted above?
The impression is that DCYS has provided extensive service interventions which, at different times, have had some short term rehabilitative effects for both Linda and Lori. However, these positive effects have not been sustained for long by the caretaker. Based on available evidence, it is doubtful that there are any untried interventions which could produce more stable effects.
Page 40 Question 11. Should the children be allowed to live with the biological parents at the present time with or without supervision?
The children should not be allowed to live with Lori for the foreseeable future. There is overwhelming evidence that she lacksthe capacity to provide a safe, secure home setting for them.There is also no reason to expect that additional services willalter the picture, and the continued uncertainty of placement andinstability in the children's home greatly jeopardizes theirpsycho social development. . . . They should also not be allowedto live in Linda's home for the foreseeable future. [Emphasis added] (Petitioner's Exhibit #2 Dr. Anderson's report).
 "Lori was seen as "volatile" and "harmful to the emotional status of [her first child]. Lori's relationship with her mother was characterized by arguments over "who abandons, CT Page 11262 beats and abuses the children more." (From Dr. David Mantell's May 19, 1990 Psychological report.) Petitioner's Exhibit #2, page 4.
This court's recitation of the history of Lori and her children is greatly handicapped and limited by the lack of the earlier psychological reports on J.W. and Christopher, Cassandra's older half-brothers, and by the fact that Lori's own file is known only from references in the Social Study For Termination of Parental Rights, Petitioner's Exhibit #9, which makes references to Lori's early DCYS involvement. If not available to this court, this information was, however available to the DCYS social workers in 1992 when Cassandra was taken into DCF care.
From DCF's own file on Lori as a child, the social workers knew or should have known that Lori spent her youth from age eleven to age eighteen in various state sponsored institutions including the Riverview Hospital ". . . where she (Lori) states she lived for several years." DCF knew that Lori has had, as of 1989, three children, each by different paternities. Her mother had four children by four different paternities.
DCF reported in a Social Study dated November, 1992, that James B., the father of Cassandra, was born on May 11, 1960. "As an adult, Mr. B. has used heroin, LSD, acid and has not stopped using drugs although he had been in treatment for a year. Mr. B. has been diagnosed with depression and paranoid schizophrenia. Mr. B. has been on various anti-depressants and antipsychotic medication for his diagnoses."
"There is overwhelming evidence . . ." that Lori came from a multi-generational dysfunctional family, lacking in appropriate parenting, emotionally deprived, sexually exploited, and physically abused. Her record as a parent of her first two children showed remarkably similar patterns of parenting. The records of DCYS are replete with reports of abuse and neglect, negative psychological and psychiatric findings, and social workers own observations to support the notion that Lori was unable in 1993, and "into the foreseeable future. . ." would be unable, to properly parent.
As if there were not enough "red flags" in this case, when the two children, Christopher and Cassandra were first removed in October 1992, the foster mother immediately reported behavioral CT Page 11263 problems between the two children. There was an increase in the aggressive behavior of Christopher and he was fondling his sister. Cassandra became sexually inappropriate, "masturbating herself often." Before Dr. Anderson completed his evaluation in March 1993, Cassandra's second foster mother reported that ". . . the child had been acting out, lying, destroying toys, and screaming at night. The child had also begun sexually acting out, and she was found stimulating herself with her stuffed animals. She indicated a fear of sleeping in the dark as she told her foster mother that "Steven (her mother's boyfriend) used to hurt me in the dark." Cassandra also expressed fear in taking a bath.
Yet DCF allowed Cassandra to languish in foster care despite the recommendations of the court appointed "experts", Dr Mantell and Dr. Anderson:
 One of the main problems found in the full evaluation report occurred in this parent-child observation session. . . . Neither child [Christopher or Cassandra] showed any spontaneous signs of affections or closeness toward the mother. . . The children did not seem to look to their mother as a provider. . . . The findings of this observation were very consistent with the main conclusions of the full evaluation report. The children did not evidence a strong attachment to their mother, and she did not demonstrate much recognition of their needs. She did not offer them any appreciable structure in the setting, and was preoccupied with her own needs. These children clearly need a stable home setting with consistent, reward-based structure. There was no evidence that contact with their mother adds to their well-being . . . The opinion of this examiner is that it is probably not in the best interests of the children to return to living with their mother in the future. They need a stable setting and competent parental caretakers. Lori's contact with the children is likely to be detrimental to their psycho-emotional development, and should be suspended or discontinued, at least until [C. W.] and Cassandra have consolidated close emotional relationships with caretakers in another home setting. (Addendum to 3/24/93 Report of Dr. Ronald Anderson, Petitioner's Exhibit #3)
With all this information available to DCF in 1993, it is incomprehensible, why DCF did not immediately amend their petition to seek co-terminus petitions for both children. DCF did little more than seek extensions of the commitments, especially CT Page 11264 for Cassandra. They did seek and obtain a termination of parental rights on behalf of Christopher in 1995. The child, Cassandra, was 2 years and 10 months old at the time she came into the commissioner's care. The child is now 7 years and 11 months of age. She has been in five foster homes. Many of the problems that Cassandra has had in the foster homes would have been completely obviated, had DCF followed Dr. Anderson s recommendations of stopping visitation and moving in the direction of permanency planning in 1993.
The court is aware that the reasons for the indecisiveness by the commissioner and her staff are manifold, not the least of which are the "inherent contradictions in the Protective Services worker's role. The worker is expected to aim for two goals, which in some instances may be mutually exclusive: reunification of the family, and protection of the child and the child's best interests."[2] A second reason for the failure of the commissioner to act in 1993 relates to the implementation of the terms of the consent decree, Juan F. v. O'Neill, CT Federal District Court Civil Action H-89-859 (1991) which required wholesale changes in the personnel, structure and operation of DCF. Social workers were elevated to supervisors and a staggering number of new workers were set loose in the field. A third event, several tragic and wholly unpredictable deaths of young children in late 1993 and early 1994 led to the formation of a blue ribbon commission to investigate those deaths. The work of that commission led to a Public Report of the Independent Panel toInvestigate the Death of Emily, April 26, 1995. This report recommended, inter alia, that every DCF employee must understand the primacy of their work: that "protection of children is its principal goal and mission." As a consequence of that report and the desire to prevent more deaths, the Commissioner mandated that all active DCF files be thoroughly reviewed and every new case be thoroughly investigated. As a further consequence of the focus on removing all children perceived to be at risk, the social worker staff may not have had sufficient time to devote to children who, like Cassandra, had already been removed and, who were believed to be, safely in placement.
It is instructive to note, relative to cases such as Cassandra's, that the Report of the Independent Panel toInvestigate the Death of Emily also recommended: "Permanency planning statutes should reflect that "short" intervals of time, such as one year, are exceptionally long in the context of the life and development of an infant. The time periods for CT Page 11265 assessment of rehabilitation of abusive and neglectful parents should reflect this fact." supra p. 30.[3]
The judiciary did not escape some measure of responsibility, as well as law enforcement, child protection services, and medical providers. With respect to the judiciary, the report recommended:
"Juvenile court judges should be authorized and willing to assume the responsibility of timely permanency planning for children including the need for termination of parental rights when reunification or family preservation is not in the child's best interest".
"There should be a select group of juvenile judges with specialized knowledge and sensitivity to the issues of child protection. This is the third state task force to recommend the institution of a separate panel of juvenile court judges."
But these issues and events are of little significance to Cassandra whose need for permanent placement was not met by the commissioner pursuant to General Statute § 17a-101 (a) ". . . to provide a . . . permanent nurturing and safe environment for children when necessary." If this child does not have or does not develop an attachment disorder, it will in no way be a tribute to the efforts made by DCF.
II. The Social Worker as Lawyer
"`[T]he termination of parental rights is defined, in General Statutes § 45-61b (g) [now § 45a-707 (g)], as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent. . . . It is, accordingly, a most serious and sensitive judicial action. Anonymous v. Norton, 168 Conn. 421, 430,362 A.2d 532, cert. denied, 423 U.S. 935, 96 S.Ct. 294,46 L.Ed.2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. Stanley v. Illinois,405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also Inre Juvenile Appeal (83-CD), [supra, 295] (noting that it is both a fundamental right and the policy of this state to maintain the CT Page 11266 integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388,71 L.Ed.2d 599 (1982). (Internal quotation marks omitted.) In re JessicaM., supra, [217 Conn. 459, 464-65, 586 A.2d 597 (1991)]." In reValerie D., 223 Conn. 492, 514, 613 A.2d 748 (1992).
While the social worker no doubt appreciates the social consequences of a termination of parental rights, it is very unlikely that the social worker who prepared the pleadings in this case involving, as it does, "the irretrievable destruction" of this family's life, has ever read Santosky v. Kramer, Stanleyv. Illinois, or even, In re Valerie D.,. It is unlikely, that the social worker has any idea what procedural due process means, or whether it was satisfied when she filed the petition in this case.[4]
Without addressing the issues of possible unauthorized practice of law raised by social workers routinely filing petitions in the superior court, it seems worthy of observing that it is a considerable misuse of the social worker's limited time. It seems clear from previous discussion of delay in this case, and the issues presented in the case of Juan F. v. O'Neill,
supra, that DCF social workers have too many cases and not enough time to devote to the delivery of social work services. It seems odd therefore, that the commissioner would impose upon them the additional burden of filing legal papers, a job for which they have no education, time or, in most cases, no enthusiasm. No other department head[5] imposes such obligations on its employees, agents or servants. This practice has evolved over time, long anteceding the case of In re Gault, 387 U.S. 1 (1967), mandating the right to counsel in juvenile delinquency cases; the Adoption Assistance and Child Welfare Act of 1980,94 Stat. 500-521, 42 U.S.C. § 620-628, 670-679a; and Child Abuse Prevention and Treatment and Adoption Reform Act of 1978,92 Stat. 208-211, 42 U.S.C. § 5111-5114 mandating legal representation in child protection cases; and it also long preceded the unification of the juvenile court into the superior court system in 1978. Whether this practice still has legal CT Page 11267 vitality, is very questionable.[6]
During the period of time prior to 1993, the agency had, by statute, lawyers assigned to it (General Statute § 17-445, later § 17a-47). It is understandable how the agency could, at that time, file its own petitions. But, in 1993, by virtue of Public Act 93-216, the agency's lawyers were transfered to the office of the Attorney General, thus placing the Commissioner in the same position as all other department heads; i.e., to rely on the Attorney General to perform its legal functions. That statute now reads:
 Sec. 17a-47. (Formerly Sec. 17-445). Legal division re child abuse and neglect. There shall be a legal division which shall consist of attorneys-at-law assigned to each regional office of the department, who shall be assistant attorneys general on the staff and under the direct supervision of the Attorney General. Said division shall diligently prosecute petitions of neglect giving priority to petitions which allege child abuse as the grounds of neglect. The Department of Children and Families shall cooperate with such attorneys in preparation of their cases and shall render such assistance to them as shall be necessary to protect the best interest of the child named in the petition.
Rather than directly address the indelicate issues of unauthorized practice of law by social workers, or the issue of whether the office of the Attorney General is abdicating its legislative directive to "diligently prosecute petitions of neglect", it seems more readily resolved by the institution of effective human resource policies by the Commissioner.[7] The commissioner of DCF might more effectively utilize her personnel by directing the AAGs to be responsible for filing court documents; i.e., practicing law, as required by statute, and, as is done by every other state agency, with the assistance of the caseworker, rather than the other way around, that is, the social workers filing court documents with the assistance of the attorneys general, as is done by no other state agency.
This issue, created by a social worker performing legal work, that is, filing pleadings, is of particular concern in matters of such potential legal severity as the termination of all parental rights, which equally importantly, effects the validity of any subsequent adoptions, as well. There are hardly any more legally serious matters filed in any court, civil or criminal. This court CT Page 11268 is deeply concerned that constitutional and statutory safeguards are not violated ". . . since termination of parental rights is the ultimate interference by the state with the natural rights of parents with their children, resulting in an everlasting severance of the legal relationship and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards". In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986); See also In re JuvenileAppeal (Anonymous), 181 Conn. 638, 640, 436 A.2d 290 (1980); Inre Juvenile Appeal (Anonymous), 177 Conn. 648, 671, 420 A.2d 875
(1979).
Given the gravity of the consequences inherent in termination proceedings, the finality of the outcome on the parents, children and caretakers, as well as the concern of the court for the proper procedural and substantive application of the law and the protection of all parties, the court will examine each of the allegations claimed by the petitioner to determine whether such claims were properly alleged, in good faith, on the basis of the facts and the law.
The Allegations of the Petition.
The petition was filed on April 24, 1996. The judicially approved form for petition to terminate parental rights allows the petitioning individual or agency to check applicable boxes regarding grounds for termination. In this case the form was JD-JM-40 Rev. 10-95. The court is satisfied that the petitioner, did not make a good faith, critical analysis regarding which non-consensual grounds to allege in the petition. Accordingly, she checked three out of the four, then existing possible grounds for a contested termination of parental rights.[8] At least one of those grounds was completely without foundation in fact or in law.[9]
While this practice may be understood by the lay social worker, unskilled in legal theory, as `covering all the bases,' it is hardly an acceptable practice for an attorney and Commissioner of the Superior Court.[10] The social worker/petitioner checked the following boxes as relevant and applicable to this case:
 (1) The child has been abandoned by the mother/father in the sense that the parent(s) failed to maintain a reasonable degree of interest, concern or responsibility as to the CT Page 11269 welfare of the child;
 (2) The child has been found in a prior proceeding to have been neglected or uncared for. The mother/father has/have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, he/she/they could assume a responsible position in the life of the child.
 (3) the child has been denied, by reason of an act or acts of parental commission or omission by the mother/father the care, guidance or control necessary for his physical, educational, moral or emotional well-being[11].
The petition must state the facts upon which the termination is sought, as well as checking the boxes for the legal grounds authorizing termination. General Statutes § 45a-715 (b)(6) and § 17a-112 (a). An attorney, after her first year law school course in civil procedure, understands the concept of fact pleading. Practice Book § 108 describes the rule as it applies to the Superior Court:
 Each pleading shall contain a plain and concise statement of the material facts on which the pleader relies, but not of the evidence by which they are to be proved, such statement to be divided into paragraphs numbered consecutively, each containing as nearly as may be a separate allegation.
The social worker, never having had a course in civil procedure, and likely, never having read P.B. § 108, appended the following sworn and subscribed statement to the petition as "To wit:"
1. The child has had no contact with the father.
2. Mother has had inconsistent contact with the child since time of placement. Child was placed out of the home in October, 1992.
3. Mother has maintained a hostile attitude toward DCF which has created a barrier to her reception of services. Mother has failed to cooperate with drug/alcohol screening.
4. While the child was in her mother's care, mother inflicted physical abuse on the child and failed to pay heed to child's sexual abuse allegations. CT Page 11270
5. Mother has failed to rehabilitate her personal situation; she has not had consistent employment and has not maintained her own residence.
6. Mother failed to receive consistent individual therapy over a period of about two years.
It is on this statement of facts that the petitioner seeks ". . . the irretrievable destruction" of Lori's family life. Santosky v.Kramer, supra.
The first "fact" relates to the father. The remaining "facts" relate to Lori:
"2. Mother has had inconsistent contact with the child since timeof placement. Child was placed out of the home in October, 1992."
It is hard to determine what this attempts to prove other than background information. The summary of facts, prepared by this same social worker, and filed with this petition, states that Lori has recently been consistent with visitation.
"3. Mother has maintained a hostile attitude toward DCF;which has created a barrier to her reception of services. Motherhas failed to cooperate with drug/alcohol screening". Being hostile to DCF is not uncommon among people who have had their child removed by the agency. It is hardly a reason to terminate a parent's legal relationship with their biological off-spring. There is no representation of what services were needed or what services were offered.
It is a matter of no consequence that mother failed to cooperate with drug/alcohol screening, absent a claim that the mother was drug or alcohol dependent, which is not alleged.
"4. While the child was in her mother's care, motherinflicted physical abuse on the child and failed to pay heed tochild's sexual abuse allegations." This allegation was the basis of the neglect finding by Judge Goldstein in July, 1993. In itself, it only provides the starting point for a claim of failure to rehabilitate. The facts to support the claim of failure to rehabilitate must be set forth. They were not.
"5. Mother has failed to rehabilitate her personal situation;she has not had consistent employment and has not maintained herCT Page 11271own residence." Neither inconsistent employment nor failure to maintain a residence, in themselves, constitute a failure to rehabilitate, nor do they disqualify a person from serving as a parent, without more.
"6. Mother failed to receive consistent individual therapyover a period of about two years." An interesting allegation, but to which ground is relevant? A more flip, but appropriate response is, so what? There is no allegation that she needed it.
If Connecticut civil practice still permitted, a demurrer, admitting all the facts well pleaded, would lie to the petition. Under the present rules of the Superior Court, a Motion to Strike under Practice Book § 152 may have been appropriate.
An unverified Summary of Facts was also attached to the petition, which hardly provided help. After stating the names of the family members, the document stated each ground and then alleged certain facts. The court will omit any material that relates to the consenting, male biological parent.
(1) The child has been abandoned by the mother and father in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
"During the child's commitment, Lori W. has had sporadic contactwith her daughter. At one point, Dr. Anderson deemed visitationdetrimental to Cassandra B.'s emotional development. It has onlybeen recently, that she has been consistent with visitation.During the interim period, however, Cassandra B.'s emotions havebeen reactionary to Lori W.'s inconsistent behaviors." (Thereupon the social worker, in what has to add new meaning to the old adage about the Pot calling the Kettle black, says:) "Both JamesB. and Lori W.'s actions have caused Cassandra to languish infoster care since October 23, 1992".
The social worker didn't seem to understand that her agency was the legally responsible custodian of this child languishing in foster care, not the parents! With respect to the facts supporting the claim of abandonment, there are none. Even including the testimony presented at trial, there was no testimony offered at trial to support this claim of abandonment by the mother. CT Page 11272
 "Abandonment focuses on the parent's conduct. In re Michael M., supra; In re Rayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987). A lack of interest in the child is not the sole criterion in determining abandonment. In re Michael M.,
supra; In re Rayna M., supra. 37. General Statutes 17a-112
(b)(1) defines abandonment as the "fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. In re Luke G., 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985)." (Internal quotation marks omitted.) In re Michael M., supra. Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. In re Juvenile Appeal
(Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981)." In Re Kezia M., 33 Conn. App. 12, 17 (1993) 632 A.2d 1122.
The petitioner makes the claim of abandonment fully knowing that the mother has been visiting the child over the entire length of the commitment, has a relationship with the child, and frequently contacts the child. The social worker knew, or should have known from a review of her own file, that while the respondent Lori may have numerous other failings, she was at all times, at the very least, interested and concerned about her daughter. The claim is legally insufficient, and was not a good faith claim against the mother. It should not be the policy of the Department of Children and Families to allow its workers, or its attorneys, to make unwarranted and groundless claims against its own "clients".
The "Summary of Facts" then addressed the respondent's failure to rehabilitate with the following factual allegations:Lori W. has failed to rehabilitate her parental skills in atimely manner. This Department has repeatedly offered Ms W.services to deal with her issues. Ms W's hostile attitude towardthis Department has been a barrier, which prevented her frommaking timely progress. There is no statement of what parental skills were lacking, what "issues" she needed to deal with, what services were offered, and the frequency or consistency of Lori's attendance. There is no allegation about how Lori has failed to rehabilitate, nor what her parental failings might be. This certainly does not constitute a concise and plain statement of CT Page 11273 the material facts on which the pleader relies.
Without further belaboring the point, the petitioner failed also to concisely and plainly state facts upon which the petitioner wishes to rely in the third ground of acts of commission or omission. The social worker did not state precisely what were the facts, dates, places, events and serious physical or emotional injury that constituted acts of omission or commission within the contemplation of General Statutes §17a-112 (c)(3)(C).
 "This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992). See also In re Theresa S., 196 Conn. 18, 25-27, 491 A.2d 355 (1985); In re Sean H., 24 Conn. App. 135, 144-145, 586 A.2d 1171, cert denied, 218 Conn. 904, 588 A.2d 1078
(1991). ". . . the termination of parental rights under the ground relied on in the petition, that is, where a child has been denied necessary care, guidance or control by reason of parental acts of commission or omission, requires proof of specific conduct that has caused serious injury to the child. Lacking evidentiary support for this conclusion, the judgment of the trial court terminating parental rights pursuant to 45a-717 (f) (2) cannot be sustained. [Internal citations omitted.] In re Kelly S., 29 Conn. App. 600, 615-616, 616 A.2d 1161 (1992).
The Facts Proved at the Trial
Moving beyond the agency allowing the child "to languish in foster care" and the abysmal state of the pleadings, the commissioner is fortunate that another assistant attorney general was assigned to the trial of the case, who, on September 29, 1997, three days before the trial commenced, moved to amend the pleadings by deleting the claims of abandonment and acts of omission or commission, which claims she was wholly unable to prove based upon a reading of the social studies. The commissioner is equally fortunate that the following compelling facts were presented, although not pleaded, which permit the court to make the necessary factual findings by clear and convincing evidence.
The parties entered into a stipulation of facts for trial. CT Page 11274 The stipulation included, in part, the following: Cassandra was born on December 28, 1989. On October 27, 1992, Cassandra was removed from the respondent Lori's care by virtue of an Order of Temporary Custody. On July 14, 1993, Cassandra was adjudicated a neglected child and committed to the care and custody of the petitioner. Expectations were signed by Lori and approved by the court. Subsequently, on April 6, 1995, Lori's parental rights were terminated with regard to Cassandra's half brother, Christopher. In August, 1996, Lori's driver's license was suspended as a result of her driving while intoxicated. On December 13, 1996, a second psychological evaluation by Dr. Anderson recommended that Lori's parental rights be terminated due to her unwillingness to accept responsibility for past problems, her continued extremely limited and unrealistic parenting skills, and due to the child's need for stability and long-term adjustment problems. In April, 1997, Dr. Robert Neems, who has been providing supervision for Lori and the child during two one-hour visits per month since 1993, changed the visitation to once per month. Dr. Neems indicated that Lori had made no visible progress in accepting responsibility for the removal of her children and that "this combination of poor comprehension and an inclination for her to blame others for her problems seriously limits [her] abilities as a parent and strongly indicates that it is not safe to return her daughter to her custody." Dr. Neems recommended termination of parental rights and that the child maintain a visiting relationship with Lori. Lastly, the parties stipulated that Cassandra has an affectionate relationship with the mother.
Dr. Anderson testified during the trial. His testimony and his recommendation were virtually unchanged since his report in 1993, ". . . except that two of her other children's rights have now been terminated." It is clear to the court from the testimony and reports that if DCF had terminated or suspended visitation in 1993, this child would have been better able to settle into a foster or pre-adoptive home within the past four years. The child is no further emotionally along than she was in 1992 with respect to a permanent home. Dr. Anderson indicated that he has been involved with Lori's case since 1984: that Cassandra is now nearly eight years of age, and that she is showing disruptive problems resulting from the uncertainty in her foster care. Continued uncertainty "will result in serious, serious problems" for Cassandra. Lori is unable to appreciate Cassandra's needs and cannot help the child cope with daily challenges of life. "This child needs more than average parental skills. Mother has far CT Page 11275 less that average parental skills."
The child was asked to draw pictures of a house, a tree, a person of each gender and then a whole family. Dr. Anderson indicated that drawings assist in evaluating a child's feelings since the child is not able to articulate her feelings. Cassandra drew a picture of her whole family. She was asked to identify the people in the picture. She did not include her biological mother. The doctor testified that excluding a primary parent is a fairly powerful demonstration of disconnection.
Dr. Anderson explained that allowing a child to have a feeling of permanency in her family enables the child to move on developmentally with other tasks in life. Counsel for mother, in cross examination, asked if it was possible, given the long period of time that DCF had kept this child in foster care, whether the child's problems were caused by DCF rather than by Lori. Dr. Anderson conceded it was possible, but that his opinion was that Lori has an emotional disorder that distorts reality and her perceptions of her daughter are disordered. Lori projects her own dependency needs upon her daughter who does not share those needs. Lori accepts no responsibility for the loss of her children and little insight into her participation in that loss. If she cannot appreciate the needs of the child, she cannot provide for those needs.
He confirmed his prior recommendations of 1993, that ". . . it is doubtful that there are any untried interventions which could produce more stable effects" for Lori, and that she is ". . . an emotionally unstable young woman with a very limited range of coping resources."
When she testified, Lori demonstrated her total lack of responsibility and understanding of her children's needs and issues. Her son, Christopher, was removed from her care and subsequently her parental rights were terminated as to this child. The precipitating events were a fire in the household set by Christopher and disclosure of a sexual exploitation of young Christopher. Lori's response to his removal was that she had put the fire out and "I took the bed outside . . ." before the authorities got there and "my brother had left the lighter there without my knowledge."
Regarding the parent aide's refusal to return to her house to help her: "The parent aide did not quit. But I had so many CT Page 11276 appointments to go to because of DCF, so they gave up coming over because I wasn't home." ergo, DCF was to blame.
Regarding Cassandra's special developmental needs: "Every child has special needs." When asked why she felt she could parent her daughter: "I have a bunny rabbit that I'm raising and I feel I could raise my daughter."
When the court inquired why she had lost her first child, Lori responded that her mother had taken him over and they (DCF) didn't really take him away from her, but rather from her mother. "He was doing good in school and so I signed him over to that foster home." As for Christopher ". . . they just stopped my visits and I never saw him again." With respect to Christopher drinking carpet cleaner, Lori's response was" ". . . it was probably alcohol." With respect to Christopher having a black eye ". . . the school never called me about anything." When asked about her brother telling DCF that she (Lori) would kick and punch the child Cassandra ". . . My brother was mad at me." When asked about Christopher being sexually abused ". . [Christopher] was telling a lot of lies at the time."
These children had profound consequences of neglectful and abusive treatment largely occurring while in Lori's care, but she does not accept any responsibility for the loss of the children, nor does she see any correlation between the loss of those children and her failings as a parent.
The month before the trial, Lori married Luis G. Mr. G. testified at the trial. His command of the English language was limited for a man who professed to graduating from a Massachusetts vocational high school in 1984. His responses were monosyllabic answers, sotto voce. He reported to being 32 years old, no prior marriages, no military experience, worked last month ". . . in tobacco and different places with a friend." He claimed to work "Six or eight hours, five days a week". He claims to have had eight years of jail time for drug offenses in Springfield, Massachusetts. He has seen the child Cassandra one time when he went for a supervised visit with Lori. He said he was not presently on probation. Nothing more is known by DCF about Mr. G. Lori had refused to give DCF any information about her new husband, so they were unable to verify any information or do a criminal background check.
A DCF social worker testified to services that were offered CT Page 11277 to Lori. She said they began offering her services in 1984. She testified to Lori being hostile to her and to treatment providers. She said that Lori was hostile and short-tempered to the parent aides from the Exchange Club, who went to Lori's home to help her. They refused to go back. She said that Lori refused to keep DCF informed of her whereabouts. She did not visit her children regularly at times. She notified DCF only that she was going to be away with her boyfriend for a couple of months. Nothing more.
The social worker testified that on one occasion while Cassandra was in foster care, Cassandra returned to the foster home following a home visit with Lori. Cassandra returned with a pink teddy bear given to her by her mother. The foster mother said that Cassandra was pretending to have sex with the bear. Cassandra told the foster mother that "Lori and Stephen (her boyfriend), do that." The foster mother said that Cassandra reported to being in bed with them when they did that.
DCF conducts administrative treatment plan reviews to discuss the progress of the parents and children, the present status and future goals. The parents' attorneys and social workers attend. The parents are always invited. Lori attended only one during the period 1993 and October 1995.
The social worker said that the only reason they didn't act in accordance with both Dr. Mantell's and Dr. Anderson's recommendations to terminate Lori's parental rights earlier was that Dr. Robert Neems, who was being paid by DCF to supervise the twice monthly, one hour visits, indicated that Lori was making progress. He monitored these visits from September, 1993, to September 1997. Although his recent report is undated, (Petitioner's Exhibit #5) it is clear from the contents that the report was prepared on or about September 17, 1997, in anticipation of the termination of parental rights trial. Dr Neems now joins Dr. Mantell, Dr Anderson, the Wheeler Clinic (Exhibit #8), and Connecticut Psychological Group psychologist Elizabeth Lachappelle, in recommending that Cassandra have some permanency in her life! The social worker apparently thought it was necessary to have complete unanimity of psychological expression before acting.
Dr. Neems finally concluded on the eve of trial, after 75 scheduled visits over four years, not all of which Lori attended, that "Cassandra is an anxious, insecure child who is in acute CT Page 11278 need of permanence in her life. She has been in foster care for an excessive number of years while she has waited for her mother to improve her parenting abilities. She needs to have a permanent living arrangement at the soonest possible time so that she can have a period of stability before she faces the challenges of adolescence."
For whatever reason, DCF and Dr. Neems failed to recognize the harm to Cassandra of "languishing" in foster care. The child's own therapist, Kate Bartos, and two independent psychologists long ago reported that Lori would benefit little from whatever services were offered, her prospect into the future for rehabilitation was extremely poor, and that the child needed a prompt and permanent, out of home placement, in a "better than average" loving caring home.(Petitioner's Exhibit #8).
The court finds that during the entire pendency of this case, from the initial order of temporary custody to the present time, the prospects for Lori's rehabilitation, given her psycho-social history, were virtually non-existent. Her poor rehabilitation prospects could not be doubted, based upon, then available, DCF file information. Further, the court finds that Cassandra's need for a permanent out of home placement was apparent at an early stage of these proceedings. Whether DCF failed to act because one professional was expressing limited optimism or because of DCF nonfeasance or indecisiveness, is less clear. Cassandra's interests, however, were not well served nor properly and expediously advanced.
Neither were Cassandra's interests well served regarding visitation. Whether the court knew of Dr. Anderson's March, 1993 recommendations, and when the court knew of them is not readily apparent. There is no doubt that the Assistant Attorney General, the social worker and the child's attorney, knew as soon as Dr. Anderson filed his report, that visitation, contact with Lori, deserved careful reconsideration:
 Lori's contact with the children is likely to be detrimental to their psycho-emotional development, and should be suspended or discontinued, at least until Christopher and Cassandra have consolidated close emotional relationships with caretakers in another home setting. (Addendum to 3/24/93 Report of Dr. Ronald Anderson, Petitioner's Exhibit #3)
When visitation is a mutually beneficial and rewarding event CT Page 11279 for the parent and child, it should be continued or even expanded. But where, as here, the court, the social worker and the child's attorney are advised by a highly regarded court appointed psychologist of detrimental "psycho-social" complications, the visitation should have been greatly reduced, if not suspended altogether.
When the issue of visitation is raised, the matter should not be addressed solely from the point of view of the parent's rights, but also from the child's optic. The child's attorney has a duty to be especially vigilent [vigilant] and energetic in advocating for the child's, not the parent's, best interest. The decision makers must make an early assessment of the likelihood, not the mere possibility, of reunification. Often, the child is prevented by visitation from becoming comfortable and bonded in the safe and secure setting of foster placement. In other cases where the child has made good adjustment and is safely and securely bonded to the foster parents, visitation is a subversive threat to the child's security. And in yet other cases, as here, visitation was for the child, a cherished illusion of unlikely future reunification. The decision-makers did no service to this child in permitting continued visitation. Had the visitation been discontinued, as recommended in 1993, this child would have been able to make early childhood adjustments and move on with her life. Indeed, Cassandra had to move from one foster home because of threats by Lori to the foster mother.(Exhibit #9 p. 9) She has not been able to "consolidate close emotional relationships with caretakers in another home setting."
ADJUDICATION
With respect to the statutory grounds for termination of parental rights, the court finds by clear and convincing evidence that this child was previously found to be have been neglected on July 14, 1993. The father has consented to the termination of his parental rights and this consent has been accepted by the court. The court further finds the mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, that she could assume a responsible position in the life of this child. General Statutes § 17a-112 (c)(3)(B). The court finds that this ground has existed for more than one year.
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e), they do not apply to the CT Page 11280 consenting father.
1) The timeliness, nature and extent of services offered. The court finds that parental, psychological and psychiatric services were offered, visitation was offered and foster care was provided by DCF. (See Exhibit #9).
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The parents had more than enough time to demonstrate their desire and concern for reunification and to achieve rehabilitation. The mother of the child was offered services she did not choose to accept. The agency provided supervised visitation and transportation services for four years. The mother's failure to achieve any awareness of her problems or of the child's needs, both normal developmental needs and special emotional needs occasioned by her long youth of impermanence and instability, prevent her from being considered for possible future care.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not fulfill nor comply with the expectations, nor cooperate with DCF, as more fully set forth in the social study.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the child does have a relationship with her mother and may even have an affectionate relationship with her, although the evidence in this regard is not consistent. It is clear to the court however, that when this child began revealing sexually inappropriate behavior, immediately after she went in to foster care, that the recommendations of Dr. Anderson should have been robustly enforced. The continuation of the relationship with Lori through visitation has hardly been worth the investment of time and expense, not to mention, the great disservice to the child to have kept her in a state of semi-stability at the same time monthly waving at her, through visitation, the unlikely prospect of reunification with her extremely limited mother.
5) As to the age of the child. The child is nearly eight years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD), 189 Conn. 276
CT Page 11281 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re AlexanderV., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD (1979).
6) The efforts the parents have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her circumstances, conduct or condition to facilitate reunification. The father has consented to the termination of his rights. Lori has maintained contact with the child. The court has clearly expressed its belief that this should have been discontinued five years ago. It has been maintained to little benefit and possibly to great harm.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the child. If anything, DCF allowed the parents access to this child far beyond what was recommended by its own experts.
DISPOSITION
Based upon the foregoing findings, the court determines that it is in the Cassandra B.'s best interest for a termination of parental rights to enter with respect to the mother Lori W. and the male biological parent James B. and, accordingly, a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for the child for the purpose of securing an adoptive family. The commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Francis J. Foley, Presiding Judge